**Rickie HOFFMAN, Mayor of the Borough of Macungie**

v.

**The BOROUGH OF MACUNGIE, Borough Council of the Borough of Macungie and Edward Harry, Jr. and James B. Martin, District Attorney of Lehigh County, Pennsylvania.**

**Appeal of James B. Martin, District Attorney of Lehigh County, Pennsylvania.**

**Rickie Hoffman, Mayor of the Borough of Macungie, Appellant**

v.

**The Borough of Macungie, Borough Council of the Borough of Macungie, Edward Harry, Jr., and Macungie Borough Police Officers Association and James B. Martin, District Attorney of Lehigh County, Pennsylvania.**

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2012.
Decided Jan. 3, 2013.

465

Heather F. Gallagher, Senior Deputy District Attorney, and James B. Martin, District Attorney, Allentown, for designated Appellant James B. Martin.

Christopher J. Cook, Harrisburg, for appellees The Borough of Macungie and Macungie Borough Police Officers Association.

Jeffrey R. Dimmich, Orefield, for appellee Rickie Hoffman.

Jeffrey S. Stewart, Allentown, for appellees The Borough of Macungie, Borough Council of the Borough of Macungie and Edward Harry, Jr.

1. 18 Pa.C.S. §§ 9101–9183.

2. Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. §§ 45101–48501. By the Act of May 17, 2012, P.L. 262, the General Assembly provided a comprehensive modernization and reorganization to the Code. This

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge SIMPSON.

In these over-litigated cross-appeals raising numerous issues, we consider several questions concerning the division of authority within the local government of the Borough of Macungie (Macungie). Specifically, we address the separation of powers between Macungie's mayor, its borough council (Borough Council), and the District Attorney of Lehigh County.

In his appeal, the District Attorney, James B. Martin (D.A. Martin), appeals an order of the Court of Common Pleas of Lehigh County (trial court) declaring Macungie's mayor, Rickie Hoffman (Mayor Hoffman), to be Macungie's chief law enforcement officer, and granting him full access to information the Macungie Police Department retains pursuant to the Criminal History Record Information Act (CHRIA).[1] D.A. Martin contends the trial court erred in interpreting the mayor's authority too broadly, and, in doing so, it potentially jeopardized his future operations and the protection of sensitive information.

By cross-appeal, Mayor Hoffman raises many issues. He first asserts the trial court did not define his authority under the Borough Code (Code)[2] broadly enough. Specifically, Mayor Hoffman con-

act was intended as a continuation of the existing law. Section 103 of the Borough Code, 53 P.S. § 45103. Thus, we consider the Code as amended and reorganized except where prohibited.

tends the trial court erred in determining the distribution of authority between Borough Council and his office over police officer discipline. Moreover, Mayor Hoffman argues Macungie Borough Ordinance (Ordinance) § 73–2 and the collective bargaining agreement (CBA) between Macungie and Macungie Borough Police Officers Association (Police Officers Association) conflict with his authority to manage the police force. Additionally, Mayor Hoffman asserts the trial court erred by enjoining him from interfering with D.A. Martin's operations and by denying him counsel fees. Upon review, we affirm most aspects of the trial court's decision, reverse in part, and remand for an initial determination as to a discrete issue involving attorney's fees only.

## I. Background

Unfortunately, it is undisputed that several dysfunctional relationships within Macungie's local government underlie this litigation. Although the genesis of this distrust and intractable behavior is not fully clear from the record, the following fairly summarizes the specific circumstances that led to this appeal.

In 2010, Macungie's residents elected Mayor Hoffman and a new Borough Council. Sometime thereafter, Mayor Hoffman asked Edward Harry Jr., Macungie's chief of police (Chief Harry), for the Police Department work schedules and a key to the police station. Chief Harry denied this request. In response, Mayor Hoffman suspended him for 10 days without pay for insubordination. Thereafter, the acting officer-in-charge sought D.A. Martin's guidance. Ultimately, the Police Department maintained its decision to decline Mayor Hoffman's request on the grounds that it needed to keep information within the police station secure.

As a result of this tension, Macungie's borough solicitor (Solicitor) issued a memorandum to Borough Council which addressed whether the mayor is entitled to access the police station and view Police Department work schedules and investigative files, and what role the mayor has in setting the work schedules. At that time, the Solicitor advised Borough Council that Mayor Hoffman is entitled to view the requested files and to have a key to the police station. The Solicitor further advised Borough Council that scheduling the police officers is subject to the CBA, not to Mayor Hoffman's control. As to the security of information, the Solicitor advised Borough Council, based on *Greene v. Prospect Park Borough Council*, 46 Pa. D. & C.3d 558 (C.P. Delaware 1987), the mayor is not an outsider to the police department; thus, CHRIA does not restrict his access to Police Department information. Furthermore, the Solicitor opined Ordinance § 73–2 requires Mayor Hoffman to direct his orders to the police force through Chief Harry.

At a regularly scheduled meeting, Borough Council overturned and expunged Chief Harry's suspension and issued him back pay for the entire term of his suspension. At that time, Borough Council also directed Chief Harry to provide Mayor Hoffman with full access to the Police Department work schedules.

Thereafter, the Police Officers Association filed suit to enjoin Mayor Hoffman from obtaining the work schedules and attempting to modify the officers' schedules. In response, Mayor Hoffman filed a separate action against Macungie, Borough Council, and Chief Harry (Borough Defendants) seeking to be declared Macungie's chief law enforcement officer and to enjoin action to the contrary. At that time, without objection, D.A. Martin intervened in opposition to Mayor Hoffman.

The trial court consolidated these two actions. After a conference before the trial court, the parties agreed to a temporary settlement. Unfortunately, the parties were unable to cooperate under the settlement. Mayor Hoffman filed an amended complaint, which included all of the original parties. At the close of pleadings, Mayor Hoffman filed a motion for summary judgment, and Borough Defendants, D.A. Martin, and the Police Officers Association each filed cross-motions for summary judgment.

In sum, Mayor Hoffman asserted that pursuant to the Code, he is entitled to full control over the chief of police and the police force. As such, he is the head of the police force; therefore, he was Macungie's chief law enforcement officer. He also argued he was entitled to unfettered access to the police station and its files. Furthermore, he asserted Ordinance § 73-2 and the CBA should not be interpreted to limit the mayor's authority. Additionally, Mayor Hoffman argued his decision to suspend Chief Harry for 10 days cannot be overturned by Borough Council. In conclusion, Mayor Hoffman requested a declaration of his authority, an injunction protecting his use of that authority, and the payment of all the legal fees and costs he incurred.

In response, Borough Defendants' argument concerned who had authority to set the police officers' work schedules, and whether Borough Council acted within its authority in reinstating Chief Harry with back pay. To that end, Borough Defendants argued the Code grants Borough Council the authority to set the police officers' schedules. Thus, Borough Council could properly negotiate away such authority under the CBA. The Police Officers Association maintained a similar position.

Moreover, Borough Council argued that because the Code allows it to reinstate a suspended officer "with pay," it provides for the complete payment of back pay. See Section 1124 of the Code, 53 P.S. § 46124. Furthermore, Borough Defendants asserted Ordinance § 73-2 required the mayor to control the police force by issuing orders to the chief of police and not by directly communicating with subordinate officers. As to Mayor Hoffman's contentions concerning access to information, Borough Defendants rested on D.A. Martin's arguments.

D.A. Martin presented a narrow issue when intervening: he intervened to prevent Mayor Hoffman from accessing protected information under CHRIA. D.A. Martin argued that a mayor is not the chief law enforcement officer of his borough, and that such an interpretation conflicts with the Municipal Police Jurisdiction Act (MPJA)[3] and Commonwealth Attorneys Act.[4]

Upon considering the motions, the trial court granted them in part and denied them in part. As to Mayor Hoffman's claims against Borough Defendants, counts I and II of his amended complaint, the trial court granted Mayor Hoffman judgment in part. Specifically, the trial court determined Mayor Hoffman to be Macungie's chief law enforcement officer. As such, the trial court determined Mayor Hoffman is entitled to unrestricted access to the Police Department station and files. The trial court also granted Borough Defendants partial judgment in determining Borough Council had authority to reinstate Chief Harry with back pay.

**3.** 42 Pa.C.S. §§ 8951–8954.

**4.** Act of October 15, 1980, P.L. 950, *as amended,* 71 P.S. §§ 732–101–732–506.

As to Mayor Hoffman's claim against Borough Defendants and the Police Officers Association, count III, the trial court nominally found in favor of the Defendants. Specifically, the trial court determined neither Ordinance § 73–2 nor the CBA infringed on Mayor Hoffman's statutory authority. To that end, the trial court determined Ordinance § 73–2 and the CBA did not conflict with the Code and ordered Borough Defendants to act accordingly.

In considering Mayor Hoffman's claim against Borough Defendants and D.A. Martin, count IV, the trial court found in favor of Mayor Hoffman and concluded that CHRIA did not interfere with the mayor's ability to access police files. Additionally, the trial court imposed reciprocal injunctions against D.A. Martin and Mayor Hoffman restraining them from interfering with the other's lawful operations.

Furthermore, the trial court declined to award Mayor Hoffman counsel fees beyond the statutory allowance of $2,500 per 12–month period, which Macungie already provided to him. Therefore, the trial court opined that it disposed of every issue before it and closed the case.

In its opinion, the trial court reasoned Macungie's mayor has final responsibility and authority over the borough's chief of police and police force. In addition to the language of the Code, the trial court determined a mayor's direct control over the police force is evidenced by his exposure to civil suits arising under 42 U.S.C. § 1983 for actions of the police force. Furthermore, the trial court reasoned Mayor Hoffman is permitted under CHRIA to have unfettered access to Police Department files in exercising his rights and duties to control the manner in which the police force operates. The trial court further reasoned that denying such access would undermine his ability to make informed decisions. Moreover, the trial court determined the MPJA, the Commonwealth Attorneys Act, and Ordinance § 73–2 do not displace the mayor's authority over the Police Department.

Moreover, as to Borough Council and Mayor Hoffman, the trial court concluded Borough Council's authority to reinstate a suspended police officer "with pay" included the authority to provide back pay. *See* Section 1124 of the Code, 53 P.S. § 46124. Additionally, the trial court reasoned the CBA and Ordinance § 73–2 did not facially conflict with the mayor's authority under the Code. D.A. Martin filed a notice of appeal, and Mayor Hoffman filed a cross appeal.[5]

## II. Issues

On appeal, D.A. Martin asserts the trial court erred in declaring Mayor Hoffman to be Macungie's chief law enforcement officer as such determination conflicts with the MPJA and the Commonwealth Attorneys Act. Furthermore, he argues the trial court erred in concluding Mayor Hoffman had the right to access protected information under CHRIA.

In his cross-appeal, Mayor Hoffman contends the trial court erred in concluding Borough Council had authority to award Chief Harry back pay for the term of his suspension. Furthermore, he contends that given the Solicitor's interpretations, the trial court erred in determining Ordi-

---

**5.** Our review of a trial court's order granting summary judgment is limited to deciding whether the court committed an error of law or abused its discretion. *Borough of Pitcairn v. Westwood,* 848 A.2d 158 (Pa.Cmwlth.2004). Summary judgment is appropriate when viewing the record in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.*

nance § 73–2 and the CBA do not interfere with his authority under the Code. Moreover, he asserts the trial court erred in enjoining him from interfering with the District Attorney's operations as such relief was not requested by any party. Mayor Hoffman also requests counsel fees in excess of the allowance provided by the Code.

### III. Discussion

#### A. Whether Mayor Hoffman is Macungie's Chief Law Enforcement Officer

##### 1. Borough Code

A borough mayor's statutory powers and duties are outlined by the Code. Sections 1001–A–1008–A of the Code, added by the Act of May 17, 2012, P.L. 262, 53 P.S. §§ 46001–A–46008–A. Within a mayor's enumerated duties is the requirement "[t]o preserve order in the borough, to enforce the ordinances and regulations, to remove nuisances, and to exact a faithful performance of the duties of the officers appointed and to perform any other duties as shall be vested in the mayor's office by law or ordinance." Section 1007–A of the Code, 53 P.S. § 46007–A. Furthermore, a mayor has the ultimate executive authority over a borough police force. Section 1123.1 of the Code, added by the Act of May 17, 2012, P.L. 262, 53 P.S. § 46123.1. Specifically, Section 1123.1 of the Code states:

> (a) *The mayor shall have full charge and control of the chief of police and the police force.*
>
> (b) *The mayor shall direct the time during which, the place where and the manner in which the chief of police and the police force perform the duties of their rank.*
>
> (c) The mayor may delegate to the chief of police or other officer supervision over and instruction to subordinate offi-

cers in the manner of performing their duties.

> (d) The mayor may appoint special police during an emergency in which the safety and welfare of the borough and the public is endangered.
>
> (e) The mayor may activate auxiliary police in accordance with general law, and notwithstanding any other provision of law, the mayor may also activate auxiliary police for purposes of crowd and traffic control for limited periods during events where, in the mayor's discretion, public safety is promoted by the activation of the auxiliary police.

53 P.S. § 46123.1 (emphasis added).

A mayor's ability to exercise full charge and control of the chief of police and the police force is not without the assistance and cooperation of the borough council. *See Bosler v. Rahn*, 395 Pa. 600, 151 A.2d 627 (1959) (acknowledging the Code, with little guidance, requires cooperation between the executive and legislative branches of municipal government in the area of police administration). Specifically, Section 1121 of the Code provides that a borough council may establish and organize a borough police department. 53 P.S. § 46121. In so doing, the borough council shall designate the ranks within the department, the duties of each rank, and may designate a chief of police. *Id.* Therefore, a borough council may create a police department and assign duties for each rank, but the mayor is responsible for coordinating the police force and maintaining order. *Salopek v. Alberts*, 417 Pa. 592, 209 A.2d 295 (1965). Stated differently, a borough council may organize a police force, but the mayor controls its day-to-day operations.

 Here, Mayor Hoffman has a duty to preserve order in Macungie and enforce Macungie's ordinances and regulations. In order to carry out this duty, Mayor Hoffman has complete control over the

manner in which the Macungie chief of police and the police force operate. *See McKibben v. Schmotzer,* 700 A.2d 484 (Pa.Super.1997) (citing *Slifer v. Dodge,* 26 Pa.Cmwlth. 99, 362 A.2d 471 (1976) (a mayor's primary duty is to supervise the police force)). Although it may be pragmatic for Mayor Hoffman to delegate some of his authority to the chief of police, or any other officer, it is his privilege to retain such authority. *See* Section 1123.1(c) of the Code, 53 P.S. § 46123.1(c). Therefore, pursuant to the rights and duties vested in the office of borough mayor by the Code, Mayor Hoffman has the ultimate executive authority over the manner in which the Police Department operates.

### 2. Ordinance § 73–2

■ Next, we consider the application of Ordinance § 73–2 to the Police Department hierarchy. Borough Council created the rank of chief of police and assigned the duties of that rank by Ordinance § 73–2. Specifically, Ordinance § 73–2 states, in pertinent part,

> [Borough] Council may nominate a person to the Civil Service Commission ... for the position of Chief of Police ... [if the Civil Service Commission determines the nominee is qualified], he may then be appointed to such position.... *The Chief of Police shall be the chief executive of the [Police Department] and shall come under the direction of the Mayor, be in charge of the police force and have supervision of its members in the exercise of their powers, duties and authority.*

Supplemental Reproduced Record (S.R.R.) at 416b (emphasis added).

On its face, Ordinance § 73–2 does not restrict Mayor Hoffman's statutory authority, nor could it. *See Holt's Cigar Co. v. City of Phila.,* 608 Pa. 146, 10 A.3d 902

(2011) (an ordinance may not obstruct the purpose and objective of a statute). In enacting Ordinance § 73–2, Borough Council defined the duties of the chief of police, but that language does not delegate or interfere with the mayor's ultimate authority under Section 1123.1 of the Code to "control" the chief of police and the police force. 53 P.S. § 46123.1. By this ordinance, Borough Council created a rank to which a mayor may delegate certain duties, while preserving in the mayor ultimate control over the Police Department. As such, Borough Defendants' assertion that Ordinance § 73–2 requires Mayor Hoffman to funnel his control over the Police Department through the chief of police is meritless. Although we agree such a chain of command may be practical and efficient, neither the Code nor Ordinance § 73–2 requires it. *See Bell v. Flood,* 8 Pa.Cmwlth. 423, 303 A.2d 244 (1973) (a mayor's authority includes minor administrative matters). Accordingly, we affirm the trial court's determination that Ordinance § 73–2 is not contrary to the Mayor's statutory authority on its face.

We next turn to Mayor Hoffman's contentions that as top executive borough officer with control over the Police Department, he is Macungie's "chief law enforcement officer," and that D.A. Martin's counterarguments relying on the MPJA and the Commonwealth Attorneys Act lack merit. For our consideration of these contentions, we are much less concerned with the label "chief law enforcement officer" than with the actual authority granted to a position.

### 3. Municipal Police Jurisdiction Act

The MPJA grants municipal police forces the authority to enforce the criminal laws of the Commonwealth within their municipalities in addition to their authority under the Code to enforce municipal ordi-

nances. In doing so, the General Assembly differentiated between a municipality's "chief law enforcement officer" and its "municipal police officer[s]." 42 Pa.C.S. § 8951.[6] The MPJA authorizes municipal police officers to enforce the laws of the Commonwealth by arrest in their municipality. 42 Pa.C.S. § 8953. In comparison, the MPJA, which does not require a chief law enforcement officer to be a municipal police officer, limits the chief law enforcement officer to directing the municipality's police force and deciding whether to request or accept aid from neighboring municipalities. *Id.*

The Pennsylvania Rules of Criminal Procedure make a similar distinction between law enforcement officers and police officers. Pa.R.Crim.P. 103. Specifically, Rule 103 defines a police officer as "any person who is by law given the power to *arrest* when acting within the scope of the person's employment." *Id.* (emphasis added). In comparison, Rule 103 defines a law enforcement officer as, "any person who is by law given the power to *enforce* the law when acting within the scope of that person's employment." Pa.R.Crim.P. 103 (emphasis added). As in the MPJA, the Rules of Criminal Procedure distinguish between individuals who can make an arrest and those who enforce the law without the authority to arrest. *See Commonwealth v. Galloway,* 525 Pa. 12, 574 A.2d 1045 (1990).

■ Here, Mayor Hoffman's statutory duties include preserving order in Macungie and enforcing Macungie's ordinances

and regulations. *See* Section 1007–A of the Code, 53 P.S. § 46007–A. Furthermore, Mayor Hoffman is vested with full control over Macungie's chief of police and police force with the authority to control the manner it conducts its operations. *See* Section 1123.1 of the Code, 53 P.S. § 46123.1. Thus, regardless of whether Mayor Hoffman may himself affect an arrest, a declaration that pursuant to the Code he controls Macungie's chief of police and police force is not inconsistent with the MPJA's definition of "chief law enforcement officer." Therefore, we affirm the trial court on this issue.

### 4. Commonwealth Attorneys Act

■ D.A. Martin's reliance on the Commonwealth Attorneys Act is equally misplaced. Section 206 of the Commonwealth Attorneys Act names the Attorney General as the chief law enforcement officer "of the Commonwealth," and district attorneys as the chief law enforcement officers "for the county" in which they are elected. 71 P.S. § 732–206. The Commonwealth Attorneys Act does not reference municipal governments or their police forces. Rather, the Act's scope is limited to defining the division of authority to prosecute between the Attorney General and district attorneys. Sections 205–206 of the Commonwealth Attorneys Act, 71 P.S. §§ 732–205–732–206; *see Commonwealth v. Carsia,* 341 Pa.Super. 232, 491 A.2d 237 (1985) (the legislative intent of the act is to clarify the authority of the Attorney General).

---

**6.** Specifically, the MPJA defines each position accordingly:

"Chief law enforcement officer." The head of a duly constituted municipal law enforcement agency which regularly provides primary police services to a political subdivision or, in the absence of any such municipal law enforcement agency, the commanding officer of the Pennsylvania State

Police installation which regularly provides primary police services to the political subdivision.

"Municipal police officer." Any natural person who is properly employed by a municipality, including a home rule municipality, as a regular full-time or part-time police officer.

42 Pa.C.S. § 8951.

The authority of the District Attorney in Lehigh County is further defined by the Home Rule Charter of the County of Lehigh (Home Rule Charter), 339 Pa.Code §§ 1.1–101–1.11–1113. *See* 339 Pa.Code § 1.5–502 (establishing the elected office of district attorney and vesting it with such authority as provided in Section 1402 of The County Code, 16 P.S. § 1402 [7]). Under the Home Rule Charter, Lehigh County municipalities expressly retain the power to operate local municipal services, such as municipal police departments, without interference of county government. 339 Pa.Code § 1.1–105. As such, the Home Rule Charter's creation of the office of the District Attorney, "shall not be construed as interfering with the rights of .... [a] borough[ ] within the County to retain powers and functions and to provide [police services]." *Id.* D.A. Martin does not address the Home Rule Charter provision.

Here, D.A. Martin, the elected District Attorney, is the chief law enforcement officer for Lehigh County. The broad discretion vested in his office to investigate and prosecute crimes on behalf of the Commonwealth is indisputable. However, his *executive* authority is limited to the county government and does not extend to the municipal level in the absence of an express statutory provision. *See* 339 Pa.Code § 1.1–105. In this home rule county, D.A. Martin's executive and policy-making authority over municipal police departments is circumscribed.

In light of the foregoing, the Commonwealth Attorneys Act designation of the district attorney as the chief law enforcement officer for a county does not provide D.A. Martin with authority to displace Mayor Hoffman's express statutory authority. While we acknowledge the benefit and practical necessity of cooperation between district attorneys and municipal police forces, the trial court did not err in determining the Commonwealth Attorneys Act does not supplant Mayor Hoffman as the elected official "with full charge and control of the chief of police and the police force" of Macungie. Section 1123.1 of the Code, 53 P.S. § 46123.1.

**B. Whether Mayor Hoffman is Entitled to Access Macungie Police Department's Files**

Under CHRIA, "[i]t [is] the duty of every criminal justice agency within the commonwealth to maintain complete and accurate criminal history record information." [8] 18 Pa.C.S. § 9111. Such information is maintained in a central repository for the use of criminal justice agencies. 18

---

7. Section 1402 of The County Code, Act of August 9, 1955, P.L. 323, *as amended*, provides in pertinent part:

Duties of district attorney; entry of nolle prosequi
(a) The district attorney shall sign all bills of indictment and conduct in court all criminal and other prosecutions, in the name of the Commonwealth, or, when the Commonwealth is a party, which arise in the county for which he is elected, and perform all the duties which, prior to May 3, 1850, were performed by deputy attorneys general. The duties herein conferred shall be in addition to all other duties given to the said district attorney by other statutes.

8. Criminal history record information is defined as:
Information collected by criminal justice agencies concerning individuals, and arising from the initiation of a criminal proceeding, consisting of identifiable descriptions, dates and notations of arrests, indictments, informations or other formal criminal charges and any dispositions arising therefrom. *The term does not include intelligence information, investigative information or treatment information, including medical and psychological information, or information and records specified in section 9104* (relating to scope).
18 Pa.C.S. § 9102 (emphasis added).

Pa.C.S. §§ 9106, 9121. Noncriminal justice agencies and individuals may also access such information upon request subject to additional restrictions. 18 Pa.C.S. §§ 9121(b), 9151.

Significantly, CHRIA also designates and *excludes* some information from the definition of criminal history information. Specifically, CHRIA regulates the manner in which a criminal justice agency retains and disseminates "protected information." 18 Pa.C.S. § 9106. Protected information includes intelligence information, investigative information, and treatment information.[9] Unlike criminal history record information, protected information is not usually reported to the central repository for state-wide access. 18 Pa.C.S. § 9106(a) (only derivative index-keys are reported). As such, the criminal justice agency that collected the protected information may only disseminate it to its authorized members, and, upon specific request, other criminal justice agencies.

Here, there is no dispute the Police Department is a criminal justice agency under CHRIA. D.A. Martin contends the office of mayor is a non-criminal justice agency subject to restricted access to criminal history record information and the prohibition against receiving protected information. However, the trial court did not determine the office of the mayor was a criminal justice agency. Rather, it reasoned that, based on Mayor Hoffman's statutory authority to control the manner in which the Police Department operates, the mayor is no less a member of the borough's criminal justice agency than the Police Department's officers.

Our review of this issue is hindered by the arguments of the parties and the ambiguity of the records sought by Mayor Hoffman. The parties primarily argue whether Mayor Hoffman is a member of a criminal justice agency for purposes of the more liberal dissemination provisions of 18 Pa.C.S. § 9121(a), regarding criminal history information.[10] Other than general

---

9. CHRIA provides the following relevant definitions:

"**Intelligence information.**" Information concerning the habits, practices, characteristics, possessions, associations or financial status of any individual compiled in an effort to anticipate, prevent, monitor, investigate or prosecute criminal activity. Notwithstanding the definition of "treatment information" contained in this section, intelligence information may include information on prescribing, dispensing, selling, obtaining or using a controlled substance as defined in the act of April 14, 1972 (P.L. 233, No.64), known as The Controlled Substance, Drug, Device and Cosmetic Act.

"**Investigative information.**" Information assembled as a result of the performance of any inquiry, formal or informal, into a criminal incident or an allegation of criminal wrongdoing and may include modus operandi information.

\* \* \*

"**Treatment information.**" Information concerning medical, psychiatric, psychological or other rehabilitative treatment pro-

vided, suggested or prescribed for any individual charged with or convicted of a crime.

18 Pa.C.S. § 9102.

10. The general regulations for dissemination of criminal history information, 18 Pa.C.S. § 9121, provide in pertinent part (with emphasis added):

(a) **Dissemination to criminal justice agencies.**—*Criminal history record information maintained by an criminal justice agency shall be disseminated without charge to any criminal justice agency* or to any noncriminal justice agency that is providing a service for which a criminal justice agency is responsible.

(b) **Dissemination to noncriminal justice agencies and individuals.**—Criminal history record information shall be disseminated by a State or local police department to any individual or noncriminal justice agency only upon request. Except as provided in subsection (b.1):

(1) A fee may be charged by a State or local police department for each request for crimi-

references in his brief and pleadings to "all files," "work schedules" and "personnel files," Mayor Hoffman does not sufficiently describe the types or location of the records he seeks. In contrast, D.A. Martin refers to "protected information" and particularly "[i]nformation pertaining to active criminal investigations or closed criminal investigations where no arrest has been made, intelligence gathering, and/or the identity of informants...." Reproduced Record at 98a (Memo from D.A. Martin to Lehigh County Police Chiefs regarding "Compliance with CHRIA").

■ We discern no error in the trial court's determination, as far as it goes. Thus, we agree Mayor Hoffman is presumptively entitled to access all hard copy files created and maintained by the Police Department. As observed by the trial court in *Greene v. Prospect Park Borough Council*, 46 Pa. D. & C.3d 558, 561 (C.P. Delaware 1987), "[t]he mayor, as chief law enforcement officer in the borough and as supervisor of the police, is not an 'outsider' against whom confidentiality and security must be maintained." *Cf. In re: Pitts. Citizen Police Review Bd.*, 36 A.3d 631 (Pa.Cmwlth.2011), *appeal denied*, —— Pa. ——, 44 A.3d 1163 (2012) (a board created to investigate reports of police misconduct not entitled to protected information where it had no authority over the manner in which the police force functioned). As a result of Mayor Hoffman's statutory rights and duties, as discussed above, he maintains a supervisory status within the Police Department and is entitled to most information gathered and maintained by the Police Department to the same extent as any officer within the Department. In sum, we agree with the trial court that as a general proposition Mayor Hoffman is a member of a criminal justice agency and entitled to the more liberal provisions for dissemination of criminal history information in Police Department files.

However, as referenced above, CHRIA contains special provisions for information in the central repository and in automated systems, especially intelligence information, investigative information and treatment information, also referred to as "protected information." 18 Pa.C.S. §§ 9106(b), (c). Access to this type of information is subject to monitoring by designated "intelligence officers." 18 Pa. C.S. § 9106(c). Moreover, there are advanced security requirements for the information, including a requirement for training of all personnel with access to protected information. 18 Pa.C.S. § 9106(f). Notably, the special provisions contain a separate penalty provision. 18 Pa.C.S. § 9106(g). Beyond mostly generic references to "protected information," neither the parties nor the trial court explain how the special CHRIA provisions at 18 Pa.C.S. § 9106 impact this controversy.

■ Based on the failure to fully develop this important aspect of the access-to-files issue, we lack a sufficient basis for judicial review. Accordingly, we conclude Mayor Hoffman waived a decision on ac-

nal history record information by an individual or noncriminal justice agency, except that no fee shall be charged to an individual who makes the request in order to apply to become a volunteer with an affiliate of Big Brothers of America or Big Sisters of America.

(2) Before a State or local police department disseminates criminal history record information to an individual or noncriminal jus-

tice agency, it shall extract from the record all notations of arrests, indictments or other information relating to the initiation of criminal proceedings where:

(i) three years have elapsed from the date of arrest;

(ii) no conviction has occurred; and

(iii) no proceedings are pending seeking a conviction.

cess to any information from the central repository or in any automated system,[11] and to protected information. *Commonwealth v. Spotz,* 552 Pa. 499, 716 A.2d 580 (1998) (issue deemed waived when party fails to properly explain or develop it in his brief). Also, we view the trial court's decision as confined to hard copy records created and maintained by the Police Department which do not require an "automated system" to access and which do not include intelligence information, investigative information or treatment information. Under our holding, Mayor Hoffman is not presumptively entitled to receive information regarding undercover investigations or intelligence operations in Macungie.

 Accordingly, as to D.A. Martin's appeal, the trial court did not err in determining Mayor Hoffman is the elected official with "full charge and control of the chief of police and the police force" of Macungie. Section 1123.1 of the Code, 53 P.S. § 46123.1. Also, he is presumptively entitled to access all the Police Department's hard copy files, such as work schedules and personnel records, including any criminal history information that may be in those files. Any future denial of access must be supported by a signed, written statement describing the type and location of the requested records, specifying the provisions in CHRIA supporting the denial of access, and explaining how the records meet the statutory criteria for protected information, all in sufficient detail to permit judicial review. Thus, those who will deny Mayor Hoffman access to Police Department records will have the burden of explaining their position.

## C. Whether the Trial Court erred in Reciprocally Enjoining Mayor Hoffman and District Attorney Martin

 "Authorities need not be multiplied in support of the rule that the relief afforded by the decree must conform to the case as made out by the pleadings, and that it must be consistent with the relief prayed for." *Christian v. Johnstown Police Pension Fund Ass'n,* 421 Pa. 240, 246, 218 A.2d 746, 749 (1966). Where a party requests general relief, a court may grant any appropriate relief that conforms to the case made by the pleadings. *Id.*

 In his amended complaint, Mayor Hoffman requested general relief. S.R.R. at 143b. Furthermore, he specifically complained of numerous ways in which the defendants, including D.A. Martin, interfered with his exercise of authority. In response, D.A. Martin asserted he is entitled to restrict the mayor's control over the Police Department in order to effectively carry out his duties as the chief law enforcement officer for Lehigh County. Given the lack of cooperation between Mayor Hoffman and D.A. Martin, and given the averments that each obstructed the other, the trial court did not abuse its discretion in enjoining each of them from interfering with the other.

## D. Whether Borough Council had Authority to Reinstate Chief Harry with Back Pay for the 10-day Suspension Imposed by Mayor Hoffman

 Section 1124 of the Code grants a mayor an independent power to suspend a police officer for 10 days without action or interference from borough council. *Moore v. Borough of Ridley Park,* 135 Pa.

11. CHRIA contains the following definition of "automated systems:"

> A computer or other internally programmed device capable of automatically accepting and processing data, including computer programs, data communication links, input and output data and data storage devices.
> 18 Pa.C.S. § 9102.

Cmwlth. 555, 581 A.2d 711 (1990). Specifically, Section 1124 states in pertinent part:

[i]n addition to the powers of council to suspend police officers, the mayor may, for cause and without pay, suspend any police officers until the succeeding regular meeting of the council, at which time or later the council may ... suspend, discharge, reduce in rank or reinstate with pay, the police officers. *A police officer suspended by the mayor may not be reinstated by council at a date earlier than [10] working days from the date fixed by the mayor for the suspension to commence. ...*

53 P.S. § 46124 (emphasis added). Where a mayor imposes a suspension of 10 days or less, the suspended police officer's remedy is an appeal to the local civil service authority, not the borough council. *McNaughton v. Civil Serv. Comm'n of Camp Hill,* 168 Pa.Cmwlth. 395, 650 A.2d 1157 (1994); *Moore* (a three-day suspension cannot be modified by a borough council).

 Here, Mayor Hoffman imposed a 10–day unpaid suspension on Chief Harry for his insubordination in declining to turn over the Police Department's work schedules. At its next regularly scheduled meeting, Borough Council reinstated Chief Harry, provided him with 10 days of back pay, and expunged the suspension from his record.

As this Court held in *Moore,* a borough council may reinstate an officer with pay only after he serves the initial 10–days of the suspension, although a broader remedy may be available from a different body. Thus, Borough Council cannot effectively undo the first 10 days of a suspension by awarding back pay for that time. Furthermore, the Code does not grant ex-

pungement powers to Borough Council. Therefore, the trial court erred in determining Borough Council had authority to reinstate Chief Harry with back pay and to expunge the 10–day suspension imposed by Mayor Hoffman. Accordingly, we reverse the trial court on this issue.

### E. Whether the CBA Interferes with the Mayor's Authority

 The Code addresses who has the authority to decide when the police force will conduct operations and to schedule the police officers. Specifically, as to the mayor, Section 1123.1 of the Code provides, "[t]he mayor shall direct the time during which, the place where and the manner in which the chief of police and the police force perform the duties of their rank." 53 P.S. § 46123.1. Under Section 1101 of the Code, a borough council is charged with prescribing the compensation for borough employees and may also establish the hours and days of work. 53 P.S. § 46101. Under this framework, a mayor directs when the police force operates, but the borough council sets the parameters for police officers' compensation. *See also* Sections 1125, 1171 of the Code, 53 P.S. §§ 46125, 46171 (referring to borough council's power to determine compensation).

It is well understood that hours of employment constitute a work condition that may be the subject of negotiation between a police bargaining unit and a municipality under Act 111.[12] Here, the CBA states, in pertinent part, "[t]he [Police Department chief of police] is responsible for setting the work schedule." Article IIA (work schedules) S.R.R. at 420b. The provision also contains a restriction regarding night shift assignments. *Id.*

---

**12.** Act of June 24, 1969, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10. (Policemen and

Firemen Collective Bargaining Act commonly referred to as "Act 111").

The parties to the CBA agreed to recognize the employer's managerial prerogative in setting police officers' schedules. *See* S.R.R. at 429b (retained management rights include "the right to establish and change work schedules within the framework of this Agreement"). The significance of Article IIA of the CBA is that members of the Police Officers Association do not have a right to control the work schedule, but they are protected against extensive night shift assignments. Article IIA of the CBA does not mention the mayor or borough council, and on its face it does not purport to distinguish between them. Certainly, there is no express provision of the CBA which limits the mayor's statutory authority, and it is questionable such a provision would withstand judicial review. Thus, as far as the present controversy is concerned, Article IIA of the CBA is a limitation on the ability of individual police officers to grieve their work assignments; it is not a limitation on an elected official.

As a result, Article IIA of the CBA does not interfere with Mayor Hoffman's statutory authority to direct when police force operations are to be manned and to "control the chief of police and the police force." Section 1123.1 of the Code, 53 P.S. § 46123.1. Therefore, we discern no error in the trial court's determination that the CBA does not infringe on Mayor Hoffman's statutory duties and powers.

### F. Whether Mayor Hoffman is entitled to Counsel Fees

■ Under Section 1117(b) of the Code, 53 P.S. § 46117(b), the borough so-licitor is required to defend all actions against, or by, a borough officer acting in his official capacity, including the mayor, at the expense of the borough. However, where a mayor and a borough council are adverse parties in an action, the solicitor, presented with a conflict of interest, must represent the borough council. *Id.* In this scenario, the mayor is entitled to $2,500 for any 12–month period for legal representation.[13] *Id.*; *Borough of Trumbauersville v. Thomas,* 740 A.2d 315 (Pa.Cmwlth. 1999). A mayor's ability to collect this statutory allowance is independent of his ability to collect counsel fees through other means. *Borough of Conshohocken v. Borough of Conshohocken Auth.,* 654 A.2d 661 (Pa.Cmwlth.1995).

■ Here, there is clearly a legal dispute between Mayor Hoffman and Borough Council. As such, the Solicitor must represent Borough Council, and Mayor Hoffman may seek outside legal counsel and up to $2,500 in reimbursement for each 12–month period for the cost of those services. Mayor Hoffman's contention that he is not truly adverse to Borough Council because of the involvement of D.A. Martin is meritless. Although D.A. Martin intervened in this litigation and may have eclipsed Borough Council in zealously contesting the mayor's assertion of authority, Mayor Hoffman's underlying complaint and cross-appeal are mainly against Borough Council. There is no dispute Borough Council provided Mayor Hoffman with $2,500 per 12–months for the costs of this litigation. Thus, the trial court did not err in denying Mayor Hoffman's re-

---

13. Pursuant to the most recent amendments to the Code, the statutory allowance under Section 1117(b) is increased to $4,000 for any 12–month period. However, Mayor Hoffman is not entitled to the increased amount. This is because the new iteration of the Code expressly provides that it is not to be imposed to affect the liabilities of any party to a suit pending at the time of enactment and that municipal officers remain subject to the conditions attached to their office at the time of their election or appointment. Section 103 of the Code, 53 P.S. § 45103.

quest for additional counsel fees under the Code.

 Mayor Hoffman, however, also claims attorney's fees as a sanction against Borough Council for vexatious conduct pursuant to 42 Pa.C.S. § 2503. The trial court did not address this aspect of the attorney's fee claim.

In his amended complaint, Mayor Hoffman did not specifically request counsel fees under 42 Pa.C.S. § 2503, although he requested attorney's fees generally and pled the facts upon which a claim for vexatious conduct could be based. Am. Compl. at ¶¶ 43–44, S.R.R. at 141b–42b. The issue was not raised in a separate motion for sanctions together with a request for hearing, as is usually done.

Nevertheless, Mayor Hoffman expressly raised this issue in his motion for summary judgment, and he relied on transcripts of disturbing statements made by members of Borough Council and the Council President at a budget meeting. S.R.R. at 441b–50b.[14] At oral argument before this Court, the attorney for Borough Council conceded that there was no way to "sugarcoat" the tenor of the statements by his clients. Thus, the uncontroverted statements in the record could well support a finding of vexatious conduct.

Given the multiple, fragmented issues, the asymmetrical alignment of the parties, the intractable nature of the disputes, and the unconventional manner in which this aspect of the counsel fee controversy was raised, the trial court's failure to address the issue is understandable. Ultimately, however, the failure to address the claim for attorney's fees as a sanction for vexatious conduct pursuant to 42 Pa.C.S.

§ 2503, is not supportable. Thus, to the extent the trial court "closed" the case, we reluctantly reverse in part and remand for an initial determination solely on this issue. The trial court is free to reopen the record, or not, as it sees fit.

### IV. Conclusion

Skilled attorneys usually exert more of a moderating influence on testy litigation than occurred here. Nevertheless, we encourage all parties and counsel to consider the monetary and emotional cost of this litigation, and to question whether the citizens of Macungie will benefit from more of it.

For all the above reasons, we affirm the trial court's order as to counts II, III, and IV of Mayor Hoffman's amended complaint. As to count I, we affirm in part and reverse in part. Specifically, we reverse the trial court's determination that Borough Council had authority to award Chief Harry back pay and expunge the 10–day suspension Mayor Hoffman imposed for insubordination. As to count V, attorney's fees, we reverse and remand for a determination of claims against Borough Council pursuant to 42 Pa.C.S. § 2503 only.

Judge BROBSON did not participate in the decision in this case.

### ORDER

**AND NOW,** this 3rd day of January, 2013, the order of the Court of Common Pleas of Lehigh County is **AFFIRMED in part,** and **REVERSED in part, and REMANDED in part** consistent with the foregoing opinion. Jurisdiction is relinquished.

---

**14.** Mayor Hoffman also asserts in a footnote in his main brief to this Court that he is entitled to counsel fees as ancillary relief pursuant to the Declaratory Judgment Act, 42 Pa.C.S. §§ 7531–7541. However, he fails to develop this argument any further; therefore, it is waived. *See Diehl v. Unemployment Comp. Bd. of Review,* 4 A.3d 816 (Pa.Cmwlth. 2010), *appeal granted,* 610 Pa. 419, 20 A.3d 1192 (2011).

CONCURRING & DISSENTING
OPINION BY Judge COHN
JUBELIRER.

I respectfully concur, in part, and dissent, in part, to the well-written Majority opinion in this matter. I generally concur with the Majority's disposition of the issues raised in these consolidated appeals; however, I dissent to the Majority's disposition of Mayor Hoffman's request for attorney's fees pursuant to Section 2503 of the Judicial Code, 42 Pa.C.S. § 2503. Based upon the record and the arguments presented by Mayor Hoffman in support of this issue, I do not believe there is any reason for a remand.

Section 2503(7) is a tool for a participant to recover fees for vexatious, obdurate or dilatory conduct during the pendency of a proceeding, 42 Pa.C.S. § 2503(7), and as our Supreme Court has stated, "[w]e do not believe the intent of the rule permitting the recovery of counsel fees is to penalize all those who do not prevail in an action." *Township of South Strabane v. Piecknick*, 546 Pa. 551, 559–60, 686 A.2d 1297, 1301 (1996). "Conduct prior to or following the pendency of the action cannot form a basis for an award of counsel fees." *Westmoreland County Industrial Development Authority v. Allegheny County Board of Property Assessment, Appeals and Review*, 723 A.2d 1084, 1086 (Pa.Cmwlth.1999).

The vexatious conduct Mayor Hoffman complains about occurred during a Borough Council budget meeting and the comments were made by one Borough Council member. Other than the statements cited by the Borough Council member during this meeting, Mayor Hoffman does not set forth any other alleged vexatious or obdurate conduct that occurred *during* the pen-

dency of these proceedings and he does not argue that the delay tactics suggested by the Borough Council member during the budget meeting actually occurred. Mayor Hoffman does not cite to, and there do not appear to have been, any delays in the progression of the litigation based upon, for example, non-compliance with discovery requests or numerous requests for continuances.

I recognize that an "award of counsel fees pursuant to [Section 2503(7) ] must be supported by a trial court's specific finding of dilatory, obdurate or vexatious conduct." *Township of South Strabane*, 546 Pa. at 560, 686 A.2d at 1301. However, the record must support the trial court's finding. Here, I believe that remanding this matter for such a finding is a waste of judicial resources where it is clear that Mayor Hoffman has failed to explain how the statements by the Borough Council member harmed his case or caused him to incur more expense.[1] Moreover, as pointed out by the Majority, "[g]iven the multiple, fragmented issues, the asymmetrical alignment of the parties, the intractable nature of the disputes, and the unconventional manner in which this aspect of the counsel fee controversy was raised," *Hoffman v. Borough of Macungie*, 63 A.3d 461, 478, 2013 WL 28387 (Pa.Cmwlth.2013) I would not protract this litigation any further based upon the scant record Mayor Hoffman relies upon to support his claim for attorney's fees pursuant to Section 2503(7).

Therefore, for the foregoing reasons, I would affirm the trial court's Order in its entirety.

---

1. I note that "an award of counsel fees is intended to reimburse an innocent litigant for expenses made necessary by the conduct of his opponent." *Westmoreland County Industrial Development Authority*, 723 A.2d at 1086–87.